## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| | ) | |
| v. | ) | 2:17-cr-00171 |
| | ) | |
| | ) | |
| JEROME BARNES, | ) | |
| | ) | |
| Defendant. | ) | |

### OPINION

**Mark R. Hornak, Chief United States District Judge**

Pending before the Court is Defendant Jerome Barnes' Motion to Suppress (ECF No. 102), in which Mr. Barnes seeks to suppress certain evidence—approximately $122,000 in United States currency, drug paraphernalia (marijuana), cell phones, nitrile gloves, and a digital scale—seized during a search of a residence on July 6, 2017.

Upon review of Mr. Barnes' Motion to Suppress, the filings of record which the Court may properly consider, and the arguments counsel presented at oral argument, the Court denies Mr. Barnes' Motion to Suppress. Based on the totality of the circumstances presented on the face of the search warrant affidavit, the Court concludes that the federal magistrate judge who issued the search warrant had a substantial basis to conclude that probable cause existed to support the search. The Court also concludes that the "good faith exception" to suppression applies in these circumstances; as such, the suppression of evidence would not be justified even if the Court had reached the opposite conclusion with respect to probable cause. Mr. Barnes' Motion to Suppress will therefore be denied.

Also before the Court are several other pretrial motions[1] filed by Mr. Barnes. (ECF Nos. 98, 99, 100, 101, 133, 135, and 136.) For the reasons that follow, the Court denies the Motion for Bill of Particulars (ECF No. 99), and grants each of the remaining motions in part and denies each in part.

## I.    **BACKGROUND**

On June 28, 2017, Mr. Barnes was indicted by a federal grand jury and charged with six counts of distributing and possessing with intent to distribute quantities of mixtures containing detectable amounts of heroin and fentanyl. (ECF No. 3.) The counts in the Indictment filed at Criminal No. 17-171 stem from six instances in which a confidential informant made a controlled drug purchase from Mr. Barnes, all of which occurred between April 28, 2017 and June 6, 2017. Mr. Barnes was arrested on July 6, 2017 and arraigned on July 13, 2017. (*Id.*; ECF No. 111, at 1.) On May 22, 2018, a federal grand jury returned a seven-count Superseding Indictment, which added at Count One a charge of conspiracy to possess with intent to distribute and distribute 400 grams or more of a mixture and substance containing a detectable amount of heroin, from in and around June 2016 until in and around July 2017. (ECF No. 50.) Mr. Barnes was arraigned on the Superseding Indictment on May 29, 2018. (ECF No. 54.)

In addition to the controlled buys, evidence was obtained as the result of the search of a residence at 200 Caldwell Avenue, Washington, Pennsylvania, 15301 ("Caldwell search"), which took place pursuant to a warrant on July 6, 2017. (ECF No. 102, ¶ 8.)[2] That evidence included bulk

---

[1] Mr. Barnes' additional pending pretrial motions are as follows: Motion to Produce Evidence that the Government Intends to Use Under Federal Rules of Evidence 404(b) and 609 (ECF No. 98); Motion for Bill of Particulars with Citation of Authority (ECF No. 99); Defendant's Discovery Motion (ECF No. 100); Motion for Production of Exculpatory Evidence and Impeachment Evidence (ECF No. 101); Defendant's Motion for Discovery of Witnesses and Confidential Informants (ECF No. 133); Motion for Disclosure of Experts Credentials (ECF No. 135); Request for Pre-trial Disclosure of Hearsay Statements Pursuant to Fed. R. Evid. 807 (ECF No. 136).

[2] The warrant application also covered a residence at 977 Broad Street, Washington, PA, 15301 and a white Lincoln MKX bearing PA registration KDE2954. (ECF No. 111, Exhibit 1.) Mr. Barnes' Motion to Suppress does not

currency, marijuana pipes, marijuana, six cell phones, a digital scale, and nitrile gloves. (*Id.*) In a motion filed on November 22, 2019, Mr. Barnes seeks to suppress all evidence seized from the Caldwell residence, arguing that the warrant affidavit lacked probable cause to search that location. (ECF No. 102.) In addition to his Motion to Suppress, Mr. Barnes moved to compel certain evidentiary disclosures. (ECF Nos. 98, 100, 101.) He also filed a Motion for Bill of Particulars. (ECF No. 99.) The Government filed an Omnibus Response to Mr. Barnes' pretrial motions on January 31, 2020. (ECF No. 111.)

Following a change of defense counsel in June of 2020, Mr. Barnes' new counsel filed a Motion to Adopt Mr. Barnes' existing pretrial motions on November 9, 2020. (ECF No. 124.) This Court granted that motion. (ECF No. 130.) Mr. Barnes then filed additional pretrial motions seeking further evidentiary disclosures on January 8, 2021, (ECF Nos. 133, 135, 136), which the Government also opposed, (ECF No. 142). This Court held a hearing and oral argument on all pending pretrial motions on July 14, 2021. (ECF No. 150.) During that proceeding, neither Mr. Barnes nor the Government sought to present testimony or evidence outside the written record as reflected on the docket. (ECF No. 153, at 10:1–11.) However, the parties agreed that the Court should view a certain redacted FBI report *in camera* following the proceeding, as it related to Mr. Barnes' Motion for a Bill of Particulars. Counsel for the Government made the redacted report available, and the Court has reviewed it on those terms. (*Id.* at 31:6–32:17.)

On August 8, 2021, Counsel for both parties filed a Joint Statement indicating that neither party would seek to supplement the record on issues related to the pretrial motions. (ECF No. 154.) The record is now closed, and all motions pending before the Court are ripe for disposition.

---

challenge the warrant as to the Broad Street residence or the Lincoln. (*See* ECF No. 102.)

## II.   **FACTUAL FINDINGS**[3]

"On a motion to suppress evidence, the trial judge sits as the finder of fact." *United States v. France*, 414 F. Supp. 3d 747, 750 (W.D. Pa. 2019) (citing *United States v. Harris*, 884 F. Supp. 2d 383, 387 n.2 (W.D. Pa. 2012)). The district court is tasked with assessing witness credibility, weighing the evidence, and drawing any appropriate inferences and conclusions from that evidence. *France*, 414 F. Supp at 750; *see also United States v. Brothers*, 75 F.3d 845, 853 (3d Cir. 1996). At the hearing on July 14, 2021, the Court heard argument only as to the legal issues relevant to Mr. Barnes' Motion to Suppress. As a result, the Court considers only the parties' briefing and exhibits in making its factual findings.[4] The primary exhibit before the Court is the affidavit in support of the search warrant application, which was authored by FBI Task Force

---

[3] While there are several ripe motions for the Court to resolve, this section focuses on the facts that inform the Court's analysis of the Motion to Suppress, as those facts also provide the necessary background for the other motions.

[4] Subsequent to the hearing, the Court reviewed a redacted report *in camera* as part of its evaluation of Mr. Barnes' Motion for Bill of Particulars. During the argument conducted on July 14, 2021, an issue arose as to whether a redacted FBI Report provided to Mr. Barnes contained sufficient information as to provide Mr. Barnes with adequate notice as to the conspiracy charge against him (Count 1 in the Superseding Indictment). After hearing arguments from both parties pertaining to the contents of the redacted report, the Court asked whether it would be useful and permissible for the Court to review the report *in camera* for the purposes of resolving the Motion for Bill of Particulars. With the consent of both parties, the Court requested the protection of the United States cause a copy of the report to be delivered to the Courtroom Deputy. (*See* ECF No. 153, at 31:6–32:17.) Thereafter the Court reviewed the report *in camera* as discussed. For the Motion for Bill of Particulars only, the Court also considers the contents of the redacted report.

Additionally, during the course of oral argument the Court asked the parties about whether Mr. Barnes had standing to challenge the search at 200 Caldwell, a question neither party addressed in its briefing. (*Id.* at 16:20–19:6, 36:25–37:13.) As a preliminary matter, the Court notes here that the concept of "standing" as used in the context of the Fourth Amendment is distinct from Article III standing, "which is jurisdictional and must be assessed before reaching the merits." *Byrd v. United States*, 138 S. Ct. 1518, 1530 (2018). For its part, Fourth Amendment "standing" is not jurisdictional but part of the substantive Fourth Amendment inquiry; it serves as shorthand for whether the individual seeking the protection of the Fourth Amendment had a reasonable expectation of privacy in the place searched. *Id.*; *United States v. Jackson*, 849 F.3d 540, 550 n.7 (3d Cir. 2017).

At oral argument, the Government conceded that Mr. Barnes had standing to challenge the search of 200 Caldwell and does not question Mr. Barnes' reasonable expectation of privacy there. (ECF No. 153, at 37:7–13.) In terms of the merits of Mr. Barnes' suppression motion, that is the end of the standing inquiry. However, the Court notes that when Defense Counsel was asked about Mr. Barnes' standing at oral argument, Counsel stated that Mr. Barnes was the leaseholder of 200 Caldwell, and that Mr. Barnes had originally rented the apartment there for his girlfriend. (*Id.* at 18:14–22.) Because the Court's review of the magistrate judge's decision is limited to "the 'four corners' of the affidavit before the magistrate," however, the Court does not consider Mr. Barnes' asserted status as leaseholder in determining whether the warrant was properly issued. *United States v. Folks*, 452 F. Supp. 3d 238, 254 (W.D. Pa. 2006) (quoting *United States v. Whitner*, 219 F.3d 289, 296 (3d Cir. 2000)).

Officer and Pennsylvania State Police Trooper Justin M. Duval ("Trooper Duval's Affidavit"). (ECF No. 111, Exhibit 1 [hereinafter "Affidavit"].) The federal magistrate judge approved the search warrant application on June 28, 2017. (*Id.*) Having defined the scope of the evidentiary record, the Court now summarizes its findings.

On July 6, 2017, officers from the Pennsylvania State Police executed a search warrant at a residence located at 200 Caldwell Avenue, City of Washington, Washington County, Pennsylvania. (ECF No. 102, ¶ 8.) As an initial matter, the Court notes that the exact interests in and activities involving the 200 Caldwell residence are somewhat unclear from the record. And as those interests in 200 Caldwell are important to the probable cause analysis, the Court finds it appropriate to explore that record in some detail as part of the discussion that follows.

Trooper Duval's Affidavit provides information with respect to the 200 Caldwell residence from three sources: (1) conversations with a confidential informant who subsequently engaged in six controlled purchases of heroin from Mr. Barnes; (2) a conversation with Detective Michael Manfredi, a detective with the Washington County District Attorney's Office Drug Task Force and a Task Force Officer with the FBI; and (3) the results of Trooper Duval's own protracted investigation.

First, Trooper Duval's Affidavit states that he had a conversation with a confidential informant in early 2017. (Affidavit ¶ 16.) During that conversation, the informant stated (1) that he/she had previously purchased heroin from Mr. Barnes at the 200 Caldwell residence and that on one such occasion, another individual was there purchasing a large amount of cocaine; (2) that he/she believed that Mr. Barnes kept drugs at the 200 Caldwell residence; (3) that Mr. Barnes had previously lived at 200 Caldwell for a short period of time but that at the time of the conversation,

Mr. Barnes' girlfriend and his girlfriend's sister[5] lived there without Mr. Barnes; (4) that Mr. Barnes' at that time resided at 977 Broad Avenue, Washington, PA, 15301;[6] and (5) that Mr. Barnes drives a white Lincoln SUV and Mr. Barnes' girlfriend drives a red Lincoln sedan. (Affidavit ¶ 16.)

Next, Trooper Duval's Affidavit recounts a conversation he had with Detective Manfredi. (*Id.* ¶ 17.) Detective Manfredi agreed that Mr. Barnes lived at 977 Broad Street and stated that Mr. Barnes' girlfriend—who Detective Manfredi identified as Ebony Miranda J. Webb—lived at 200 Caldwell Avenue. According to Trooper Duval's Affidavit, Detective Manfredi shared that he knew Mr. Barnes and Ms. Ebony Webb to "frequent" both the residence at 977 Broad Street and the residence at 200 Caldwell.[7] Detective Manfredi also related that Ms. Ebony Webb drives a red Lincoln sedan—information which matched the description given by the confidential informant during the conversation with Trooper Duval in early 2017. (Affidavit ¶ 17.)

Finally, Trooper Duval's Affidavit contained his own first-hand investigative findings. The Affidavit recounts the circumstances of six controlled drug buys from Mr. Barnes, each of which was undertaken by the same confidential informant under the supervision of Trooper Duval. (*Id.* ¶¶ 18–31.) These purchases took place between April 2017 and June 2017 and are the subject of Counts 2 through 7 of the Superseding Indictment. (*Id.*; ECF No. 50.) Each of the purchases was arranged by the confidential informant with Mr. Barnes through Mr. Barnes' Snapchat profile ID,

---

[5] Identified elsewhere in the record as Ms. Alexus Webb. (ECF No. 153, at 16:12–18.)

[6] The Affidavit uses both "Street" and "Avenue" when describing the address at 977 Broad []. The Court finds that these refer to the same location, 977 Broad Street, Washington, Pennsylvania, 15301.

[7] The Court notes that these two residences are approximately 0.3 miles apart, a fact of which the magistrate judge could have taken judicial notice when making his probable cause determination. *See United States v. Stearn*, 597 F.3d 540, 564 (3d Cir. 2010) ("The magistrate may have additionally taken judicial notice that 4049 Higbee is a mere half-mile from the location of Joseph Doebley's September 28 drug sale, made at the intersection of Higbee and Cottage Streets.").

"Savage Gentlemen." (Affidavit ¶¶ 19, 24, 26, 28, 29, 31.) Each of the controlled buys implicated the residence at 977 Broad Street, either because they occurred in the immediate vicinity of that residence or because Mr. Barnes left that residence directly prior to meeting with the confidential informant. (*Id.* ¶¶ 20–22, 25, 26, 27, 30, 31.) According to Trooper Duval's Affidavit, Mr. Barnes often picked up the confidential informant in his white Lincoln MKX during these transactions. (*See, e.g.*, *id.* ¶ 25.)

One of the controlled buys, which occurred on May 19, 2017 and is listed as Controlled Buy #4 in Trooper Duval's Affidavit, additionally implicated the residence at 200 Caldwell. The specific timeline of the events is relevant. According to Trooper Duval's Affidavit, the confidential informant had already been in contact with Mr. Barnes when the informant met with Trooper Duval at 10:30 AM on May 19, 2017. (*Id.* ¶ 27.) After meeting with Trooper Duval, the confidential informant went to await further directions from Mr. Barnes as to where the purchase would occur. (*Id.*) At 11:23 AM, Mr. Barnes was observed by law enforcement leaving 977 Broad Street and getting into his white Lincoln MKX. (*Id.*) The Lincoln was then observed at 200 Caldwell by Detective Manfredi. (*Id.*) At 11:27 AM—just four minutes after he initially left the residence at 977 Broad Street (not a surprising time interval given the physical proximity of the two involved residences but remarkably short if it included a social visit)—Mr. Barnes was observed *leaving* 200 Caldwell through the front door while on the phone. (*Id.*) Two minutes later—at 11:29 AM— Mr. Barnes picked up the confidential informant at Fayette Street and Hart Avenue. (*Id.*) Mr. Barnes turned the corner, let the confidential informant out of the Lincoln, and returned to 977 Broad Street. (Affidavit ¶ 27.) Trooper Duval's Affidavit stated that the confidential informant related that just prior to meeting with Mr. Barnes, Mr. Barnes had contacted the confidential informant on Snapchat to let him/her know that he (Mr. Barnes) had arrived. (*Id.* ¶ 28.)

One additional piece of information relates—if indirectly—to the residence at 200 Caldwell. According to Trooper Duval's Affidavit, the drugs purchased by the confidential informant during Controlled Buy #4—the same purchase where Mr. Barnes visited 200 Caldwell immediately prior to meeting the informant—were delivered in a McDonald's bag which contained a voter registration application receipt for Ms. Ebony Webb, Mr. Barnes' girlfriend, who, according to Trooper Duval's conversations with the confidential informant and Detective Manfredi, lived at 200 Caldwell Avenue. (*Id.*) However, this receipt listed Ms. Ebony Webb's address as 977 Broad Street, not 200 Caldwell. (*Id.*)

Parsing these various averments, the Court finds that Mr. Barnes did not himself *live* at 200 Caldwell at the time of the search; rather, he lived at 977 Broad Avenue. The Court also finds that Ms. Alexus Webb—the sister of Mr. Barnes' girlfriend Ms. Ebony Webb—did live at 200 Caldwell at the time of the search. Where exactly Ms. Ebony Webb resided at the time of the search remains unclear. Trooper Duval's Affidavit states that both the confidential informant and Detective Manfredi relayed that Ms. Ebony Webb lived at 200 Caldwell. On the other hand, the voter registration application receipt found in the McDonald's bag listed Ms. Ebony Webb's address as 977 Broad Avenue. The Court also notes that in the Government's Omnibus Response, the Government argued that "the issuing authority could rationally infer that Mr. Barnes and Ms. [Ebony] Webb no longer resided at 200 Caldwell Avenue (and instead resided at 977 Broad Avenue)." (ECF No. 111, at 27.)

In the end, the Court finds no need to resolve the issue of where Ms. Ebony Webb resided at the time of the search. The Court finds that the evidence on the face of the Affidavit plainly suggests that Ms. Ebony Webb either lived at 200 Caldwell at the time of the search or was at least a frequent social guest there. Either scenario would explain why Trooper Duval observed her

vehicle at 200 Caldwell on multiple occasions. (*See* Affidavit ¶ 17.) For Mr. Barnes' part, the Affidavit contains the statements of the confidential informant that Mr. Barnes previously lived at 200 Caldwell and that the informant had previously bought drugs from Mr. Barnes at 200 Caldwell; the statement of Detective Manfredi that Mr. Barnes "frequent[ed]" 200 Caldwell (*Id.*); and the circumstances of Controlled Buy #4, where Mr. Barnes visited 200 Caldwell directly before transacting business with the confidential informant.[8]

Based on the foregoing information, the federal magistrate judge authorized the search of 200 Caldwell. Officers with the Pennsylvania State Police carried out the search on July 6, 2017 and uncovered bulk currency, marijuana pipes, marijuana, six cell phones, a digital scale, and nitrile gloves at the 200 Caldwell residence. (ECF No. 102, ¶ 8.)

## III.    **Motion to Suppress (ECF No. 102)**

Mr. Barnes argues that the search of 200 Caldwell violates the Fourth Amendment because the underlying warrant affidavit did not contain a sufficient showing of probable cause that evidence of drug distribution would be found within that residence. (ECF No. 102, ¶ 13.) Moreover, Mr. Barnes contends that the affidavit was "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." (*Id.* ¶ 11 (quoting *United States v. Leon*, 468 U.S. 897, 923 (1984)).) Specifically, he argues that "no reasonable police officer could have relied on the search warrant to search [Ms. Alexus Webb's] home." (*Id.* ¶ 13.) If true, this would take the search of 200 Caldwell outside of the *Leon* good faith exception under one of the four carveouts that are recognized by the Third Circuit. *See, e.g.*, *United States v. Zimmerman*, 277 F.3d 426, 436–37 (3d Cir. 2002). As a result of these arguments, Mr. Barnes contends that all the

---

[8] The Court notes that while Trooper Duval reported that he frequently observed Ms. Ebony Webb's car at 200 Caldwell, (*Id.*), that in and of itself does not tie Mr. Barnes to the residence, especially given the uncertainty about whether Ms. Ebony Webb lived there herself.

evidence seized from the 200 Caldwell residence should be suppressed. (ECF No. 102, ¶ 14.)

Mr. Barnes' assertion that the affidavit was so lacking in probable cause so as to take it outside of the good faith exception necessarily subsumes the argument that the affidavit did not contain sufficient evidence to give the magistrate judge a substantial basis to conclude that probable cause existed. Because these arguments implicate different legal standards, however, the Court will consider them separately, beginning with the argument that the affidavit did not provide a substantial basis for the magistrate to conclude that probable cause existed.

### A.  Legal Standard

The Fourth Amendment of the United States Constitution protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches." U.S. Const. amend. IV. It further provides that "no Warrants shall issue but upon probable cause supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." *Id*. Mr. Barnes challenges the search of 200 Caldwell on the grounds that the warrant was issued without adequate probable cause; he does not contest the existence of the warrant or its particularity. As such, the primary focus of this Opinion will be on whether the warrant affidavit for 200 Caldwell contained sufficient probable cause to satisfy the Fourth Amendment.

"The threshold requirement for the issuance of a warrant is probable cause." *United States v. Ritter*, 416 F.3d 258, 262 (3d Cir. 2005). The test is "whether the magistrate had a 'substantial basis' for concluding that probable cause was present." *Id*. (quoting *Illinois v. Gates*, 462 U.S. 213, 236 (1983)). In determining whether a "substantial basis" exists, a district court must assess "the totality of the circumstances" that was before the issuing authority. *Id.* (quoting *Gates*, 462 U.S. at 236). The Third Circuit has cautioned that this after-the-fact assessment "should not take the form

of *de novo* review." *Id.* (internal quotation marks omitted) (citing *United States v. Ninety-Two Thousand Four Hundred Twenty-Two Dollars and Fifty-Seven Cents ($92,422.57)*, 307 F.3d 137, 146 (3d Cir. 2002)). Rather, a district court's review for "substantial basis" is "one step removed from a directed probable cause" analysis: courts must pay "great deference" to a magistrate judge's determination and should not "invalidate [warrants] by interpreting [affidavits] in a hypertechnical, rather than a commonsense, manner." *Id.* at 264 & n.8 (alteration in original) (quoting *Gates*, 462 U.S. at 236).

Moreover, a reviewing court is confined "to the facts that were before the magistrate judge, *i.e.*, the affidavit, and [may] not consider information from other portions of the record." *United States v. Jones*, 994 F.2d 1051, 1055 (3d Cir. 1993). "Stated otherwise, the District Court is restricted to viewing only the information confined by the 'four corners' of the affidavit before the magistrate." *United States v. Folks*, 452 F. Supp. 3d 238, 254 (W.D. Pa. 2020) (citing *United States v. Whitner*, 219 F.3d 289, 295–96 (3d Cir. 2000)). And timing matters, as "post-hoc justification for stops and searches has been repeatedly rejected." *United States v. Ubiles*, 224 F.3d 213, 218 (3d Cir. 2000), *as amended* (Sept. 28, 2000); *see also Florida v. J.L.*, 529 U.S. 266, 271 (2000) ("The reasonableness of official suspicion must be measured by what the officers knew before they conducted their search."). Thus, neither side may argue for or against probable cause based on the evidence that was actually uncovered by the search.

In determining whether there is probable cause to search a particular location, direct evidence linking the place to be searched to the crime under investigation is not required. *Jones*, 994 F.2d at 1056. Rather, "probable cause can be, and often is, inferred by 'considering the type of crime, the nature of the items sought, the suspect's opportunity for concealment and normal inferences about where a criminal might hide'" evidence of the crime. *Id.* (quoting *United States*

*v. Jackson*, 756 F.2d 703, 705 (9th Cir. 1985)). While there is an important distinction between probable cause to arrest and probable cause to search, "[i]f there is probable cause to believe that someone committed a crime, then the likelihood that that person's residence contains evidence of the crime increases." *Id.* at 1055–56.

In the context of drug distribution, the Third Circuit has long held "that evidence . . . is likely to be found where the [drug] dealers reside." *United States v. Burton*, 288 F.3d 91, 103 (3d Cir. 2002) (alteration in original) (quoting *United States v. Whitner*, 219 F.3d 289, 297–98 (3d Cir. 2000)). This inference is based on the reality "that evidence associated with drug dealing needs to be stored somewhere" and "a dealer logically could conclude that his residence is the best, and probably the only, location to store items such as . . . large amounts of cash, assets purchased with proceeds of drug transactions, guns to protect drugs and cash, and large quantities of drugs to be sold." *Whitner*, 219 F.3d at 298.

However, the Third Circuit also made clear in *Burton* that the fact that an individual is suspected of being a drug dealer does not give law enforcement an unqualified right to search their residence. Instead, probable cause to search derives from "evidence supporting three preliminary premises: (1) that the person suspected of drug dealing is actually a drug dealer; (2) that the place to be searched is possessed by, or the domicile of, the dealer; and (3) that the home contains contraband linking it to the dealer's drug activities." *Burton*, 288 F.3d at 104.[9] In terms of the third premise, a number of factors may help substantiate the inference that the home contains contraband, including the scale of drug operations, the geographic proximity of the residence to the location(s) where drugs are being sold, and the conclusions of officers—based on their training

---

[9] Notably, *Burton* "does not specify the quanta of evidence required to support each 'preliminary premise.'" *United States v. Stearn*, 597 F.3d 540, 566 (3d Cir. 2010).

and experience—about where evidence is likely to be found. *United States v. Stearn*, 597 F.3d 540, 559–60 (3d Cir. 2010) (collecting cases).

### B.  The Parties' Arguments

Mr. Barnes argues that magistrate judge did not have a substantial basis to determine that there was probable cause to search 200 Caldwell because the warrant affidavit "did not sufficiently tie Mr. Barnes' alleged contemporaneous narcotics distribution to" that residence. (ECF No. 102, ¶ 13.) While Mr. Barnes concedes that he was involved in "documented drug activity . . . in and around the search warrant application date," he argues that "that by no means creates probable cause to search any residence Mr. Barnes has ever lived in or was known to visit on occasion." (*Id.*) And at oral argument, Counsel for Mr. Barnes further emphasized that the affidavit did not contain any detail as to the duration, frequency, or purpose of visits by Mr. Barnes to 200 Caldwell. (ECF No. 153, at 14:6–11.) Based on these arguments, Mr. Barnes asserts that the warrant to search 200 Caldwell was "so lacking in indicia of probable cause" that "no reasonable police officer could have relied on [it]." (ECF No. 102, ¶ 13.)

The Government argues in response that 200 Caldwell was not just any residence, but a "'stash-house' for narcotics and/or the proceeds of narcotics distribution." (ECF No. 111, at 27.) The Government points to statements in Trooper Duval's Affidavit that the confidential informant believed Mr. Barnes kept drugs at 200 Caldwell and that the informant had previously purchased drugs from Mr. Barnes at that residence. (*Id.* at 28–29.) It argues that the confidential informant's statements were corroborated by Detective Manfredi and the remainder of Trooper Duval's investigation, particularly the events which occurred during the course of Controlled Buy #4, when Mr. Barnes visited 200 Caldwell while he was apparently actually in the midst of a drug transaction. (*Id.* at 29.) Based on this information, the Government argues that the magistrate judge

had a substantial basis for concluding there was probable cause to search 200 Caldwell. (*Id.* at 30.)

### C. Discussion

In order to uphold the warrant for 200 Caldwell, the Court must determine that the magistrate judge had a substantial basis for concluding there was probable cause that evidence of drug dealing would be found in 200 Caldwell. *Burton* illustrates one way to meet that standard. It outlines a specific set of premises, which, if adequately supported, permit a finding of probable cause that evidence will be found in a suspected drug dealer's home, even absent direct evidence linking the home to drug activity.

But *Burton* does not provide the only avenue to find the existence of probable cause. Indeed, the probable cause inquiry is fundamentally flexible: it considers the totality of the circumstances and jettisons bright-line rules. *United States v. Stearn*, 597 F.3d 540, 559 (3d Cir. 2010) (quoting *Illinois v. Gates*, 462 U.S. 213, 232 (1983)). The Court concludes that even if the *Burton* analysis does not resolve the issues in this case, the premises outlined in *Burton* provide a useful heuristic for the type of indirect evidence, which when viewed alongside the direct evidence available here, supports a finding of probable cause considering the totality of the circumstances.

Because the Government relied heavily on *Burton* in its briefing and at oral argument, the Court begins by analyzing the *Burton* premises. The Court concludes that whether the magistrate judge could have found a substantial basis for probable cause under a strict *Burton* analysis is a relatively close call. The Court further concludes, however, that it need not conclusively resolve the *Burton* issue, because in any event, the Court must then proceed to a broader analysis which considers all the direct and indirect evidence available to the magistrate judge who authorized the warrant and the search—an analysis which is informed but not constrained by *Burton*. Under this broader analysis, the Court determines that the magistrate judge did have a substantial basis for

determining that there was probable cause that evidence of drug distribution would be found at 200 Caldwell. The Court then also concludes that even if there was not a substantial basis for the magistrate judge to find probable cause, the good faith exception under *Leon* is applicable under the circumstances, and the evidence from 200 Caldwell should not be suppressed.

    1.  *Applying the* Burton *Analysis*

        i.  Whether Mr. Barnes is actually a drug dealer

The Court concludes that Trooper Duval's Affidavit contained sufficient evidence for the magistrate judge to conclude that Mr. Barnes was actually a persistent drug dealer. According to the Affidavit, Trooper Duval met with the same confidential informant on six separate occasions to arrange controlled purchases of heroin from Mr. Barnes. (Affidavit ¶¶ 18–31.) On each of these occasions, Trooper Duval searched the confidential informant to determine that the informant did not have any contraband on his person and then provided the confidential informant with official funds to make the controlled purchase involved; the confidential informant contacted Mr. Barnes on Snapchat to arrange a meeting; the confidential informant was observed by law enforcement meeting with Mr. Barnes; and shortly thereafter the confidential informant provided a package containing drugs back to Trooper Duval. (*Id.*) Testing conducted by the Pennsylvania State Police Regional Laboratory determined that each package contained a detectable amount of heroin and a detectable amount of fentanyl. (*Id.*)

Over the course of the six controlled buys, the confidential informant exchanged a total of $7,700 in official funds for 62 bricks of heroin. (*See id.* ¶¶ 22, 25, 26, 28, 30, 31.)[10] According to Trooper Duval's Affidavit, each "brick" contains 5 "bundles," each of which contains 10 "stamp

---

[10] The figures in Trooper Duval's Affidavit indicate that the confidential informant could get heroin from Mr. Barnes at a rate of $100 per brick. (*Id.* ¶ 16.) However, the confidential informant had existing debts with Mr. Barnes. Some of the controlled buys therefore contained a higher payment of official funds than would have been indicated by the amount of heroin received, in payment of a portion of the confidential informant's debts. (*E.g.*, *id.* ¶ 27.)

bags," which in turn each contain a single serving of heroin. (*Id.* ¶ 12.) Doing some math, this means that over the course of about six weeks, Mr. Barnes sold the confidential informant more than 3,000 individual servings of heroin. Each of these transactions was documented in detail in Trooper Duval's Affidavit, down to the text of the Snapchat messages the confidential informant exchanged with Mr. Barnes. The Court concludes that this was more than enough evidence to satisfy the first prong of the *Burton* test.[11]

   ii. Whether 200 Caldwell is possessed by, or the domicile of, Mr. Barnes

   The second prong of the *Burton* test—whether Mr. Barnes was domiciled at or possessed 200 Caldwell—is a much closer call. *Black's Law Dictionary* defines domicile as "[t]he place at which a person has been physically present and that the person regards as home." *Merriam-Webster* similarly defines domicile as "the place of residence either of an individual or of a family." As discussed *supra*, it appears clear from the face of the affidavit that Mr. Barnes did not consider 200 Caldwell to be his home at the time of the search. Instead, Mr. Barnes resided at 977 Broad Street. And based on the record which this Court may consider, the Court concludes that Mr. Barnes was not domiciled at 200 Caldwell on July 6, 2017.

   That leaves the question of whether Mr. Barnes *possessed* the residence at 200 Caldwell on July 6, 2017. Limiting its review—as it must—to the "four corners" of Trooper Duval's Affidavit, the Court concludes that the evidence that Mr. Barnes had possession of 200 Caldwell

---

[11] The Court concludes that the evidence of the six controlled purchases of heroin was sufficient to allow the magistrate judge to conclude that Mr. Barnes was actually a drug dealer. This conclusion is bolstered by the fact that a warrant for Mr. Barnes' arrest on drug distribution charges was issued on the same day as the search warrant, and that arrest warrant has not been challenged. In addition to the evidence of the controlled purchases, however, the magistrate might also have considered the fact that Mr. Barnes has multiple previous charges for drug distribution, including charges of possession with intent to distribute crack cocaine from 2008, which resulted in the imposition of a 10-year term of imprisonment. (Affidavit, ¶ 14–15); *see also United States v. Stearn*, 597 F.3d 540, 557 (3d Cir. 2010) ("'[t]he use of prior arrests . . . is often helpful' to establish probable cause, particularly where 'the previous arrest or conviction involves a crime of the same general nature as the one which the warrant is seeking to uncover.'") (quoting *United States v. Conley*, 4 F.3d 1200, 1207 (3d Cir. 1993)).

at the time of the search is relatively limited.[12] Returning briefly to the dictionaries, *Black's Law Dictionary* defines "possess" as "[t]o have in one's actual control." *Merriam-Webster* also provides a definition for "possess" that references "control"—namely, "to seize or gain control of." With respect to control, Trooper Duval's Affidavit contains the statement of the confidential informant that he/she had previously bought drugs from Mr. Barnes at 200 Caldwell, the statement that he/she believed Mr. Barnes stored drugs at 200 Caldwell, the stop at 200 Caldwell during Controlled Buy #4, and other visits by Mr. Barnes to the 200 Caldwell property.

The statement that Mr. Barnes sold drugs out of 200 Caldwell, if true, would suggest an inference that he had at least some control over those premises. And as discussed below, the confidential informant proved to be reliable on several fronts during this investigation. The Court, however, does not find the statement that the informant previously purchased drugs from Mr. Barnes at 200 Caldwell to be particularly instructive on the question of Mr. Barnes' control of 200 Caldwell *at the time of the search*. The probative value of this statement is complicated by another statement made by the confidential informant: that Mr. Barnes himself previously resided at 200 Caldwell. The Affidavit does not provide any indication of just when these events occurred in relation to one another, including, most importantly, whether the prior purchase occurred during the time Mr. Barnes was living at 200 Caldwell.[13] Placed in this context, the Court concludes that

---

[12] The Court does not consider here Defense Counsel's statement at oral argument that Mr. Barnes was the actual leaseholder of 200 Caldwell, as there was no indication of that fact on the face of Trooper Duval's Affidavit. *See supra* note 4.

[13] It strikes the Court that if it were known that the prior purchases were alleged to have taken place when Mr. Barnes *did not* reside at 200 Caldwell, such fact would logically be more probative of his later use of the 200 Caldwell residence for drug distribution (at the time of the warrant, when he similarly *did not* reside there) than would prior purchases alleged to have taken place when Mr. Barnes *did* reside at 200 Caldwell. If the prior purchases were alleged to have occurred when Mr. Barnes *did* reside at 200 Caldwell, such residence there would be in effect a confounding variable because it would be impossible to tell whether Mr. Barnes sold drugs at Caldwell in the past because it was his home or because it was a convenient location which he had access to. That would in turn complicate the inference that because he previously sold drugs there, evidence was likely to be found there at the time of the search, when a possible explanation for his doing so in the past (namely, his residence there) had been removed from the equation.

undated prior drug transactions said to have occurred at 200 Caldwell cannot be considered strong evidence that Mr. Barnes possessed 200 Caldwell at the time of the search.

Probable cause, however, requires considering and analyzing the totality of the circumstances, and Trooper Duval's Affidavit also contains the confidential informant's statement that he/she believed that Mr. Barnes stored drugs at 200 Caldwell, as well as information about the stop Mr. Barnes made at 200 Caldwell while in the midst of a drug transaction and his other visits to the residence. The Court concludes that the brief visit made to 200 Caldwell during the course of Controlled Buy #4, as well as Mr. Barnes' credibly reported frequent visits to the property, suggest Mr. Barnes had actual and easy *access* to 200 Caldwell.

Whether or not those visits provide evidence of *control* is a more difficult question. On the one hand, the events which occurred during Controlled Buy #4—particularly given their limited duration and temporal placement in the midst of a drug transaction—seem to reflect something far different than a mere social call. *See also United States v. Stearn*, 597 F.3d 540, 567 (3d Cir. 2010) (noting that a defendant's "autonomous ingress and egress into" a residence "suggested that he had some degree of dominion over the property"). On the other hand, the Court recognizes that the evidence here may be weaker than in other cases that have analyzed this prong under a similar theory of control. For example, in *Stearn*, the defendant entered a home three times during a four-hour period, including at least one occasion when he entered with a key; he also apparently received a visitor at that property, rather than merely being a guest there himself. *Id.* at 568. While the Third Circuit declined to determine whether there was probable cause in that case, it was "confident that [based on these facts] the affidavit contained sufficient probable cause to satisfy the good faith exception" under *Leon. Id.*; *see also United States v. Majeed*, No. 08-cr-186, 2009 WL 2393921, at *2 (E.D. Pa. Aug. 4, 2009) (finding that a defendant possessed his girlfriend's

residence in addition to his own home when he had keys and a garage door opener for his girlfriend's home).

Ultimately, the Court does not need to resolve the tangled question of possession of the 200 Caldwell premises for two reasons. First, the Court concludes that even if there is not sufficient evidence in the Affidavit to satisfy all prongs the *Burton* test, under a broader totality of the circumstances analysis, the evidence on the face of Trooper Duval's Affidavit constitutes a "substantial basis" for the magistrate judge to conclude that there was a "fair probability" that evidence of drug distribution would be found in 200 Caldwell when the warrant was sought and issued. Second, the Court concludes that under the good-faith exception as defined in *Leon*, there was sufficient indicia of probable cause as to render official reliance on the warrant not "objectively unreasonable," whether under *Burton* or otherwise. The first reason has significant overlap with the third prong of the *Burton* test, which the Court turns to next.

> iii. Whether 200 Caldwell contains contraband linking it to Mr. Barnes' drug
> activity

The third premise implicated in *Burton* is that "the home contains contraband linking it to the dealer's drug activities." *Burton*, 288 F.3d at 104. In *Stearn*, the Third Circuit provided a number of factors that may help substantiate this inference, including the scale of drug operations, the geographic proximity of the residence to the location(s) where drugs are being sold, and the conclusions of officers—based on their training and experience—about where evidence is likely to be found. 597 F.3d 540, 559–60 (3d Cir. 2010) (collecting cases). The Court concludes that each of these factors point toward an inference that 200 Caldwell contained contraband when the search warrant was issued.

First, a significant quantity of drugs was exchanged between the confidential informant

and Mr. Barnes, and Mr. Barnes appeared to have easy access to those drugs. The confidential informant purchased more than 3,000 servings[14] of heroin from Mr. Barnes over the course of about six weeks. (Affidavit ¶¶ 22, 25, 26, 28, 30, 31.) Each individual purchase involved about 10 bricks of heroin, representing 500 individual "stamp bags" (each of which held one serving). (*Id.*) In addition to the quantity of drugs at issue, Trooper Duval's Affidavit suggests a strong inference that Mr. Barnes' supply of heroin was readily accessible. The amount of time that passed between when the confidential informant contacted Mr. Barnes to set up a meeting and when the meeting occurred was usually less than an hour. (*Id.* ¶¶ 19–31.)[15] In fact, Trooper Duval's Affidavit states that during Controlled Buy #6, the confidential informant asked to wait to contract Mr. Barnes until he/she was in position as Mr. Barnes had been "arriving relatively quickly." (*Id.* ¶ 31.) The informant's concerns were borne out when Mr. Barnes left his residence at 977 Broad Street within a few minutes of being contacted. (*Id.*) And on only one occasion was Mr. Barnes not able to provide the confidential informant with the full quantity of heroin he/she requested: in advance of Controlled Buy #3, the confidential informant sought 20 bricks of heroin, but Mr. Barnes was only able to provide 11 when he initially met with the confidential informant. However, Mr. Barnes provided a further 9 bricks less than 4 hours later. (*Id.* at ¶¶ 23–26.)

Second, the 200 Caldwell residence was in close proximity to where the drugs were being sold. As discussed at note 7, *supra*, 200 Caldwell is 0.3 miles from Mr. Barnes' residence at 977 Broad Street.[16] The timing of events during Controlled Buy #4 also points to the proximity of 200

---

[14] The term used in Trooper Duval's Affidavit (*See* Affidavit ¶ 12.)

[15] Measured from time the confidential informant first contacted Mr. Barnes (or the start of the confidential informant's meeting with Trooper Duval if the time of the first message was not available) and excluding Controlled Buy #4 as on that occasion the affidavit states that the informant had already been in contact with Mr. Barnes when he/she met with Trooper Duval.

[16] Each of the controlled buys took place either at 977 Broad Street, at the corner of Hart Street and Fayette Avenue, or somewhere in between. The intersection of Hart and Fayette is approximately 0.5 miles from 200 Caldwell.

Caldwell to Mr. Barnes' drug distribution operations. Only six minutes elapsed between the time Mr. Barnes left his residence at 977 Broad Street and when he picked up the confidential informant near the intersection of Fayette Street and Hart Avenue. (*Id.* ¶ 24.) During this time, Mr. Barnes traveled by car to 200 Caldwell, entered that residence, exited that residence, and drove back at least 0.5 miles to the other side of 977 Broad Street to pick up the confidential informant. (*Id.*)[17]

Finally, the magistrate judge was permitted to rely on Trooper Duval's conclusion that evidence of drug distribution was likely to be found in 200 Caldwell. Trooper Duval's Affidavit stated that he had been a Pennsylvania State Trooper for more than 13 years and a member of the FBI's Task Force for 6 years. (Affidavit ¶ 1.) The Affidavit listed his involvement in enforcing the Pennsylvania Controlled Substance, Drug, Device and Cosmetic Act: more than 250 investigations, participation in at least 150 search warrants (including 50 or more where he was personally the affiant), and approximately 150 arrests. (*Id.*) Trooper Duval also listed the various drug and vice-related trainings he had attended, including Operation Shield, DEA Basic Narcotics

---

[17] The Court pauses to note that the nexus between 977 Broad Street and the controlled buys does not materially limit the inference that evidence of drug distribution would be found at 200 Caldwell. It is true that the line of cases culminating in *Burton* starts from the premise that "a dealer logically could conclude that his residence is the best, and probably the only, location to store items" related to drug distribution. *United States v. Whitner*, 219 F.3d 289, 298 (3d Cir. 2000). The Court in *Whitner*, however, drew from the general proposition that "probable cause can be, and often is, inferred by 'considering the type of crime, the nature of the items sought, the suspect's opportunity for concealment and normal inferences about where a criminal might hide stolen property.'" *Id.* (quoting *United States v. Jones*, 994 F.2d 1051, 1055–56 (3d Cir. 1993)). And in *United States v. Stearn*, the Third Circuit rejected an "attempt to substitute bright-line rules for a more 'fluid . . . assessment of probabilities in particular factual contexts.'" 597 F.3d 540, 559 (3d Cir. 2010) (quoting *Illinois v. Gates*, 462 U.S. 213, 232 (1983)). The Court in *Stearn* upheld the search of one defendant's home, despite facts which showed that the defendants sold drugs out of a gym one of them owned. *Id.* at 558. The Court determined that "even if another location is an equally likely repository of evidence, a magistrate may infer probable cause to search the drug dealer's home so long as the affidavit establishes a nexus between the dealer's home and the crime under investigation." *Id.* at 560. While the circumstances are reversed in this case, the principles apply just as easily. Under the flexible approach endorsed by the Third Circuit, the evidence in Affidavit permits a reasonable inference that evidence of drug dealing would be found at 200 Caldwell, taking into account the "the type of crime, the nature of the items sought, the suspect's opportunity for concealment and normal inferences about where a criminal might hide stolen property." *Whitner*, 219 F.3d at 298 (quoting *Jones*, 994 F.2d at 1055–56). The Affidavit never alleged that 200 Caldwell was the only location where Mr. Barnes might have stored evidence of drug distribution. The fact that Trooper Duval sought warrants for both residences suggests his belief, based on his training and experience, that both might contain the evidence he sought. And the Court concludes that based on the law of this Circuit, the magistrate judge was permitted to accept and rely on that conclusion.

Investigation, and Drug Identification training courses. (*Id.*)

Trooper Duval further stated in the affidavit that:

[I]t is generally a common practice for drug traffickers to store all or part of their drug inventory and drug-related paraphernalia . . . in residences they own, live in, or have access to, or in "stash-houses", that is, a residence of another person utilized by the drug dealer to store or package drugs, cash, and drug-related items.

(*Id.* ¶ 5.) Among the items Trooper Duval stated were commonly found in stash-houses were "[c]ontrolled substances, such as heroin, fentanyl . . . and marijuana"; "[p]araphernalia for packaging, processing, diluting, weighing, and distributing controlled substances, such as scales . . . "; [c]ash, currency, and records relating to controlled substances income . . ."; and [c]ellular phones and other electronic devices." (*Id.* at ¶ 3.) Trooper Duval based his statements on his involvement in the current investigation and previous investigations, his experience debriefing confidential informants and cooperating drugs dealers, discussions with other law enforcement officers about their own experiences, and the training and intelligence he had received through his job. (*Id.* ¶ 10.)

In *United States v. Whitner*, the Third Circuit explained that "[t]he issuing judge or magistrate may give considerable weight to the conclusions of experienced law enforcement officers regarding where evidence of a crime is likely to be found." 219 F.3d 289, 296 (3d Cir. 2000) (quoting *United States v. Caicedo*, 85 F.3d 1184, 1192 (6th Cir. 1996)). Trooper Duval's Affidavit contained information suggesting that, at minimum, Mr. Barnes had access to 200 Caldwell and frequently visited that location, making it a likely candidate for a stash-house. Trooper Duval had observed Mr. Barnes' activities in the area of 799 Broad Street and 200 Caldwell over the course of multiple months. He (Trooper Duval) also had the statements of a reliable confidential informant that Mr. Barnes kept drugs at 200 Caldwell. Finally, Trooper Duval's own observations and the observations of other law enforcement officers suggested that

Mr. Barnes had made a stop at 200 Caldwell while in the midst of a drug transaction in the period leading up to when the search warrant was sought. Based on this information and his training and experience, Trooper Duval indicated his belief that evidence of drug distribution would be found at 200 Caldwell. The magistrate judge was entitled to give that conclusion considerable weight. The Court concludes that there was sufficient evidence in Trooper Duval's Affidavit to support the third prong of the *Burton* test.

### 2. Direct evidence linking 200 Caldwell to drug distribution activity

Thus far, the Court has focused on the premises underlying *Burton*, which allows for an inference of probable cause that evidence of drug distribution will be found where drug dealers reside, even in the absence of direct evidence. As discussed *supra*, the Court concludes that whether or not Trooper Duval's Affidavit satisfies the *Burton* test is a close call, particularly given the lack of persuasive evidence on the face of the affidavit that Mr. Barnes' possessed 200 Caldwell at the time of the search.

Ultimately, however, the Court does not need to determine whether there was probable cause under *Burton*, because *Burton* is not the only avenue available to establish probable cause. Rather, it provides one illustration of the kind of flexible, totality of the circumstances analysis that courts apply to probable cause determinations. And even in cases where *Burton* does not directly apply, the *Burton* premises can inform the Court's analysis because they suggest the sort of evidence that, together with permissible inferences, counsels in favor of finding probable cause. The Court now steps outside the precise strictures of *Burton* to consider the direct evidence linking 200 Caldwell to drug distribution, which alongside the indirect evidence discussed above, informs the Court's totality of the circumstances analysis.[18]

---

[18] The Court recognizes that there is some overlap between the information considered here and that considered in the previous section—for example, in Section III(C)(1)(ii), the Court considered whether the events which occurred

The primary pieces of direct evidence supporting a finding that evidence of drug distribution was likely to be found at 200 Caldwell include (1) the confidential informant's statement that he/she had previously purchased drugs from Mr. Barnes at 200 Caldwell and that another individual was there on one such occasion purchasing a large quantity of cocaine; (2) the confidential informant's statement that Mr. Barnes stored drugs at 200 Caldwell; and (3) the "pit stop" at 200 Caldwell made by Mr. Barnes while he was in the course of Controlled Buy #4. The Court will evaluate the probative value of each of these indicators in turn.

First, the Court observes that analysis of the probative value of the confidential informant's statement that he/she had previously purchased drugs from Mr. Barnes at 200 Caldwell is complicated by Mr. Barnes' reported change in residence from 200 Caldwell to 977 Broad Street. As discussed above, in addition to stating that he/she had previously *purchased drugs* from Mr. Barnes at 200 Caldwell, the informant also stated that Mr. Barnes previously *lived* at 200 Caldwell. And there is no indication on the face of the affidavit as to when the alleged purchases at 200 Caldwell occurred—particularly as to whether they occurred during the period in which Mr. Barnes also resided at 200 Caldwell. Further to this point, Trooper Duval's Affidavit states that when he first spoke to the confidential informant in early 2017, the informant stated that he/she had already been purchasing heroin from Mr. Barnes for one year, representing a long window of time in which the alleged purchases at 200 Caldwell may or may not have coincided with Mr. Barnes' reported residence at that address. Given the dearth of precise temporal information about when these purchases occurred and when Mr. Barnes' moved to 977 Broad Street, the Court concludes that this statement, on its own, is not strongly indicative that evidence of drug

---

during Controlled Buy #4 permit an inference that Mr. Barnes possessed 200 Caldwell. However, the Court now considers this evidence for its value in *directly* linking 200 Caldwell to drug distribution, rather than in service of the *Burton* analysis.

distribution would be found at 200 Caldwell at the time of the search.

The other two pieces of evidence, however, are much more informative and persuasive, and in the Court's view also place the evidence just discussed in a much different and more compelling light. During Trooper Duval's initial conversation with the informant, the informant also relayed his/her belief that Mr. Barnes kept drugs at 200 Caldwell. (Affidavit ¶ 16.) This belief appears to have been contemporaneous, as in, the informant believed that *at the time of the conversation*, Mr. Barnes kept drugs at 200 Caldwell. There are two potential issues with this statement: (1) whether the confidential informant's contemporaneous belief that Mr. Barnes kept drugs at 200 Caldwell was reliable, and (2) whether the information from the informant about that belief was "stale" at the time of the search. Both issues, however, are resolved by what happened in the aftermath of the initial conversation.

The first potential issue relates to the reliability of the confidential informant. While statements by "law enforcement officials during the course of an investigation [are] generally presumed to be reliable," the same is not true with respect to confidential informants. *United States v. Yusuf*, 461 F.3d 374, 384–85 (3d Cir. 2006). Instead, "[i]nformants are not presumed to be credible, and the government is generally required to show by the totality of the circumstances either that the informant has provided reliable information in the past or that the information has been corroborated through independent investigation." *Id.* at 384. If, however, the magistrate considers the totality of the circumstances and determines that the facts support a finding of probable cause, the magistrate "may issue a warrant relying primarily or in part upon the statements of a confidential informant." *United States v. Stearn*, 597 F.3d 540, 555 (3d Cir. 2010).

Here, the informant's considerable credibility was established through the six controlled purchases he/she made from Mr. Barnes. The facts that the informant was able to easily contact

25

Mr. Barnes over Snapchat and could make significant purchases of heroin on short notice lend credence to the statement that the confidential informant had previously purchased drugs from Mr. Barnes. Moreover, "[if] an informant is right about some things, he is more probably right about other facts." *United States v. Stearn*, 597 F.3d 540, 557 (3d Cir. 2010) (alteration in original) (quoting *Illinois v. Gates*, 462 U.S. 213, 244 (1983)). And in this case other pieces of information provided by the informant were substantiated during Trooper Duval's investigation. The informant provided information about where Mr. Barnes lived, where Mr. Barnes' girlfriend lived, and about the vehicles driven by both Mr. Barnes and his girlfriend. (Affidavit ¶ 16.) All of this information was corroborated by Detective Manfredi, who stated that he was very familiar with Mr. Barnes. (*Id.* ¶ 17.) *Yusuf* counsels that "government agents should generally be able to presume that information received from a sister governmental agency is accurate," 461 F.3d at 378, and there is nothing in the record to rebut the presumption that Trooper Duval could trust Detective Manfredi. Finally, the information about residences and vehicles was also corroborated by Trooper Duval's own extensive investigations.[19] All of this interlocking corroboration generates a very considerable quantum of credibility for the confidential informant and what he/she told law enforcement as the investigation was unfolding and the search warrant was sought.

Finally, and most importantly, the informant's account was strongly corroborated by the events that occurred during Controlled Buy #4, when Mr. Barnes stopped by 200 Caldwell immediately prior to delivering heroin to the confidential informant. At oral argument, counsel for Mr. Barnes argued that it is not unusual for individuals to make social calls at the homes of their

---

[19] While details about a defendant's home and vehicle may appear innocuous, innocent details can still provide valuable corroboration. *See, e.g.*, *Stearn*, 597 U.S. at 556 (recognizing the corroborative value when police observed a defendant spending the night at a residence and operating vehicles described by an informant); *see also Gates*, 462 U.S. at 269 (White, J., concurring) ("The critical issue is not whether the activities observed by the police are innocent or suspicious. Instead, the proper focus should be on whether the actions of the suspects, whatever their nature, give rise to an inference that the informant is credible and that he obtained his information in a reliable manner.").

relatives or significant others if they happen to be nearby. (ECF No. 153, at 21:1–7.) The Court agrees with that generalization as far as it goes, and notes that not every social call made by a drug dealer would necessarily cast suspicion on the residence of those they visit. *See United States v. Shields*, 458 F.3d 269, 277 (3d Cir. 2006) ("It is well established that a search 'must be supported by probable cause particularized with respect to that person,' and that 'mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person.'") (quoting *Ybarra v. Illinois*, 444 U.S. 85, 91 (1979)). But activity that appears innocent out of context can take on a new and quite different meaning when placed in the surrounding circumstances. *Stearn*, 597 F.3d at 557 (citing *Gates*, 462 U.S. at 243 n.13).

Here, those circumstances are that Mr. Barnes chose to visit 200 Caldwell immediately (as in just moments) prior to providing drugs to the confidential informant, despite the fact that 200 Caldwell is in the opposite direction from his residence at 977 Broad Street as is the location where the confidential informant was waiting. (Affidavit ¶ 27.)[20] The argument that the Caldwell stop was a social call is belied by the fact that only six minutes elapsed between the time Mr. Barnes left 977 Broad Street and when he picked up the informant (with the stop at 200 Caldwell occurring in the interim). (*Id.*) In fact, Mr. Barnes *left* 200 Caldwell just four minutes after he first departed 977 Broad Street. (*Id.*) The residences are close together, but even so, Mr. Barnes was in 200 Caldwell for at most three to four minutes. And Mr. Barnes exited 200 Caldwell while on the phone, further undermining the argument that he was socializing while inside. (*Id.*) Against this factual backdrop, the magistrate judge would have been operating with the common experience that such a short stop was far more consistent with dropping something off—or importantly here,

---

[20] While the record doesn't indicate that Mr. Barnes knew the informant's location when he left 977 Broad Street, the Court concludes that this would be a reasonable inference given that Mr. Barnes had previously picked up or dropped off the informant at the location on at least two prior occasions. (*See* Affidavit, ¶¶ 20, 25, 27.)

picking something up—rather than making a visit to socialize with friends or family.

The stop at 200 Caldwell during Controlled Buy #4 also lessens any concerns related to the second potential issue: whether the information from the confidential informant that Mr. Barnes stored drugs at 200 Caldwell was "stale" at the time of the search. While the parties do not raise this argument directly, the Court notes that "[t]he age of the information supporting a warrant application is a factor that must be considered in determining probable cause. If information is too old, it may have little value in showing that contraband or evidence is still likely to be found in the place for which the warrant is sought." *United States v. Williams*, 124 F.3d 411, 420 (3d Cir. 1997) (discussing *United States v. Harvey,* 2 F.3d 1318, 1322 (3d Cir. 1993)) (citation omitted). Here, Trooper Duval's Affidavit states that the initial conversation with the confidential informant occurred in "early 2017." (Affidavit ¶ 16.) The search of 200 Caldwell, on the other hand, occurred several months later, in early July of 2017. (ECF No. 102 ¶ 2.)

The Court concludes that any concerns about "staleness" are mitigated by the nature of the alleged criminal activity at issue and that in any event, the confidential informant's tip from early 2017 was refreshed by the events of Controlled Buy #4. First, "when an activity is of a protracted and continuous nature, 'the passage of time becomes less significant.'" *United States v. Williams*, 124 F.3d at 420 (quoting *United States v. Harris,* 482 F.2d 1115, 1119 (3d Cir. 1973)). "The likelihood that the evidence sought is still at the place to be searched depends on . . . the nature of the crime, of the criminal, of the thing to be seized, and of the place to be searched." *Id*. (quoting *United States v. Tehfe,* 722 F.2d 1114, 1119 (3d Cir. 1983), *cert. denied sub nom., Sanchez v. United States,* 466 U.S. 904 (1984)). The type of criminal activity in this case, drug trafficking, is the very sort of "continuous and protracted" activity that "diminishes the significance of staleness." *U.S. v. Cintron*, 243 F. App'x 676, 679 (3d Cir. 2007) (citing *Tehfe*, 722 F.2d at 1119). Additionally,

"stale information can be refreshed with newer information that relates back to the subject of the older information." *Id.* The Court concludes that in this case, the stop at 200 Caldwell in the midst of Controlled Buy #4 refreshed and corroborated the confidential informant's statement from early 2017 that Mr. Barnes stored drugs at that residence.[21]

In order to satisfy the demands of the Fourth Amendment, the "issuing court need only conclude that it would be reasonable to seek the sought-after objects in the place designated in the affidavit." *United States v. Ritter*, 416 F.3d 256, 263 (3d Cir. 2005). "[The] court need not determine that the evidence is in fact on the premises." *Id.* And at this stage of review, the inquiry is one level removed. In order to uphold the search here, this Court must only find that there was a "substantial basis" for concluding that probable cause was present. *United States v. Conley*, 4 F.3d 1200, 1205 n.2; *Gates*, 462 U.S. at 238–39. It does not matter whether "a different magistrate judge might have found the affidavit insufficient to support a warrant"; the role of the district court is not to make its own assessment. *United States v. Jones,* 994 F.2d 1051, 1057 (3d Cir. 1993).

---

[21] As to the question of whether the information relating to Controlled Buy #4 was itself stale, the Court concludes that while the interval between Controlled Buy #4 and the issuance of the search warrant for 200 Caldwell (about six weeks) is longer than that upheld in some other cases, it is within an acceptable range given the totality of the circumstances here, particularly as to the nature of the criminal conduct at issue. A number of cases involving drug trafficking have upheld warrants based on events that occurred between two and three weeks before the search at issue. *See, e.g.*, *United States v. Caple*, No. 07-cr-394, 2008 WL 5146556, at *12–15 (M.D. Pa. Dec. 8, 2008), *aff'd*, 403 F. App'x 656, 659 (3d Cir. 2010) (upholding search where the last controlled buy took place seventeen (17) days before the search); *United States v. Gorny*, No. 13-cr-70, 2014 WL 2860637, at *7–8 (W.D. Pa. June 23, 2014) (same, with intervening period of 15 days); *United States v. Coles*, 264 F. Supp. 3d 667, 681 (M.D. Pa. 2017) (upholding an intervening period between a defendant's presence at a location and its search of between two and three weeks).

While the time interval here is somewhat longer, "[a]ge alone . . . does not determine staleness." *United States v. Ruffin*, 664 F. App'x 224, 227 n.4 (3d Cir. 2016) (quoting *United States v. Harvey*, 2 F.3d 1318, 1322 (3d Cir. 1993)); *see also United States v. Zimmerman*, 277 F.3d 426, 435 (3d Cir. 2002) (explaining that "no bright line [] can be drawn" with respect to what interval makes information stale in a child pornography investigation). And in *United States v. Harris*, the Third Circuit explained that "[t]he question of the staleness of probable cause depends more on the nature of the unlawful activity alleged in the affidavit than the dates and times specified therein." 482 F.2d 1115, 1119 (3d Cir. 1973). To that end, in *United States v. Gallo*, a panel of the Third Circuit affirmatively quoted the District Court's determination below that in the context of drug trafficking, "intervals of weeks or months between the last described act and the warrant application [do] not necessarily make the information stale." 110 F. App'x 265, 268 (3d Cir. 2004). While not precedential, the Court finds the *Gallo* case persuasive on the question of whether the information provided by the events of Controlled Buy #4 was stale, and ultimately concludes that it was not.

Here, the Court determines that, relying on *Burton* alone, the outcome of the probable cause inquiry would be a close call. But the Court ultimately concludes that it is not necessary to resolve the outcome under an analysis that is strictly limited to only the *Burton* framework because of the direct evidence linking 200 Caldwell to drug distribution. That evidence is (1) the confidential informant's statement that he/she had previously purchased drugs from Mr. Barnes at 200 Caldwell and that another individual was there on one such occasion purchasing a large quantity of cocaine; (2) the confidential informant's statement that Mr. Barnes stored drugs at 200 Caldwell; and (3) the stop at 200 Caldwell made by Mr. Barnes while he was in the course of Controlled Buy #4. The confidential informant's statement that he/she previously bought drugs from Mr. Barnes at 200 Caldwell is of limited value on its own considering the uncertainty about whether that occurrence coincided with Mr. Barnes' own prior residence at that address. But when viewed in light of that same reliable informant's contemporaneous belief that Mr. Barnes stored drugs at 200 Caldwell and taking account of the events of Controlled Buy #4, the prior purchase at 200 Caldwell represents one link in a chain of conduct tying Mr. Barnes' alleged drug trafficking activities to that residence. Based on the totality of those circumstances, the Court concludes that the magistrate judge had a substantial basis to issue the search warrant for 200 Caldwell.

### 3. Good Faith Exception

The Government argues that even if the Court were to conclude that the magistrate judge did not have a substantial basis to conclude that probable cause existed to search 200 Caldwell Avenue, the good faith exception, as defined in *United States v. Leon*, 468 U.S. 897 (1984), applies to uphold the officers' reliance on the warrant and to preclude the suppression of evidence that is sought by Mr. Barnes' Motion. (ECF No. 111, at 30–32.) The good faith exception is grounded in the deterrence rationale behind the exclusionary rule and its focus on the willful actions of law

enforcement. "The exclusionary rule is not a tool to deter mistaken magistrate judges." *United States v. Wilburn*, No. 18-cr-115, 2021 WL 1310423, at *20 (W.D. Pa. Apr. 8, 2021) *(citing Davis v. United States*, 564 U.S. 229, 238–39 (2011)). Rather, its application will only be appropriate if exclusion of evidence will "appreciably deter governmental violations of the Fourth Amendment." *United States v. Katzin*, 769 F.3d 163, 170 (3d Cir. 2014) (en banc) (citing *Leon*, 468 U.S. at 909, 918).

"In the ordinary case, an officer cannot be expected to question the magistrate's probable-cause determination or his judgment that the form of the warrant is technically sufficient." *Leon*, 468 U.S. at 921. On the other hand, the mere existence of a warrant does not give law enforcement *carte blanche* to search according to its terms—exclusion is proper where the officer had "no reasonable grounds for believing that the warrant was properly issued." *Id.* at 922–23. The Third Circuit has recognized four carveouts to the good faith exception:

- Where the magistrate issued the warrant in reliance on a deliberately or recklessly false affidavit;

- Where the magistrate abandoned his judicial role and failed to perform his neutral and detached function;

- Where the warrant was based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; or

- Where the warrant was so facially deficient that it failed to particularize the place to be searched or the things to be seized.

*E.g.*, *United States v. Zimmerman*, 277 F.3d 426, 436–37 (3d Cir. 2002). Mr. Barnes relies on the third point, arguing that "[t]he affidavit in support of the search warrant was so lacking in indicia of probable cause" as to imply that "no reasonable police officer could have relied on the search warrant." (ECF No. 102 ¶ 13.) Mr. Barnes' specific objection is that Trooper Duval's Affidavit did not "sufficiently tie Mr. Barnes' alleged contemporaneous narcotics distribution to [200

Caldwell]." (*Id.*)

For all the reasons discussed *infra*, the Court firmly disagrees. Trooper Duval's Affidavit contained the statement by the confidential informant that Mr. Barnes stored drugs at 200 Caldwell. The informant's credibility was established over the course of six controlled buys. The short "pit stop" at 200 Caldwell in the course of Controlled Buy #4 further corroborated the informant's account and provided additional direct evidence that indicia of drug distribution were likely to be found at 200 Caldwell. The Court's analysis of the *Burton* premises, while ultimately inconclusive standing alone,[22] demonstrates that there was also significant indirect evidence of the type that has been found to contribute to a finding of probable cause. Moreover, the evidence in the affidavit was contextualized by Trooper Duval's statement—based on his significant training and experience—that drug dealers often stored evidence of their activities in a stash-house. The Court concludes that the affidavit contained sufficient indicia of probable cause as to give the magistrate a "substantial basis" for issuing a warrant. But even in the event that the affidavit did not rise to the quantum of evidence necessary for probable cause before the magistrate judge, there was certainly sufficient indicia to allow a reasonable officer to rely on its authority, and importantly no red flags on the face of the Affidavit or search warrant which would have, or should have, stopped the executing officers in their tracks before they conducted the search of 200 Caldwell.

The Motion to Suppress will be denied.

---

[22] While the Court does not ultimately decide whether the magistrate judge had a substantial basis to issue the warrant based on a strict *Burton* analysis, the Court does conclude that the search of 200 Caldwell would be upheld based on a *Burton* analysis under the good faith exception. As discussed *supra*, the Court determined that the second prong of *Burton*—requiring evidence that Mr. Barnes was domiciled at or possessed 200 Caldwell—presented a close call. The executing officers had no way of determining whether the magistrate judge issuing the warrant based his decision only on the *Burton* test or on a more generalized analysis that considered all the direct and indirect evidence. And it was not for them to question a legal determination by a federal judge that potentially implicated highly technical concepts such as the line between access to and possession of 200 Caldwell. As the Third Circuit stated in *United States v. Zimmerman*, "law enforcement officers are not attorneys." 277 F.3d 426, 436 (3d Cir. 2002). "'When judgment calls . . . are required,' officers should be able to rely on the magistrate judge's determination of the law." *United States v. Hodge*, 246 F.3d 301, 309 (3d Cir. 2001) (quoting *United States v. Williams*, 3 F.3d 69, 74 (3d Cir. 1993)).

IV.     **Motion for Bill of Particulars (ECF No. 99)**

Pursuant to Federal Rule of Criminal Procedure 7(f), Mr. Barnes asks the Court to direct the Government to provide a Bill of Particulars. (ECF No. 99.) Mr. Barnes makes this request only with respect to Count One of the Superseding Indictment, which charges him with conspiracy to distribute and possess with intent to distribute 400 grams or more of a mixture containing a detectable amount of fentanyl and heroin. (*Id.* ¶ 2.) Mr. Barnes argues that the language in the Superseding Indictment does not provide him with sufficient notice as to the particulars of his conspiracy charge, limiting his ability to prepare his defense in advance of trial. (*Id.*) He focuses on the fact that the Superseding Indictment states only that the alleged conspiracy took place between "around June 2016" and "around July 2017," and that it involved "persons known and unknown to the grand jury." (*Id.*) Mr. Barnes points out that "[n]o additional information or overt acts are alleged in the superseding indictment." (*Id.*)

In response, the Government first argues that Mr. Barnes' request for a Bill of Particulars is untimely. (ECF No. 111, at 10.) Alternatively, the Government argues that even if the Court were to permit Mr. Barnes to make his motion at this time, his request should be denied because he either already has sufficient information or will receive sufficient information in advance of his trial. The Government argues that the Superseding Indictment "provides the defendant with adequate notice of the essential facts of the case—the length of the conspiracy and the illicit drugs involved," and points to its disclosures of cell phone extraction reports and Pennsylvania State Police Reports which detail the evidence found as a result of the searches at 200 Caldwell Avenue and 977 Broad Street. (*Id.* at 11–13.)

The Court notes that since the time Mr. Barnes' motion was originally filed, the Government made available to Mr. Barnes a redacted FBI report—the same report that the Court

33

at the request of counsel reviewed *in camera* following oral argument.[23] Finally, the Government argues that some of the information Mr. Barnes seeks relates the identity of cooperating witnesses and the sum and substance of their testimony, information it states is covered by the Jencks Act and is not discoverable at this time. (*Id.* at 12–13.) The Government argues that once this information is disclosed—and the Court notes that the Government has since agreed to do so at least two weeks in advance of trial—Mr. Barnes will have "a complete picture of the government's theory" of his involvement in the conspiracy charged at Court One of the Superseding Indictment. (*Id.*)

Federal Rule of Criminal Procedure 7(f) states that "[t]he court may direct the filing of a bill of particulars." A court is authorized under Rule 7(f) to direct the government to file a bill of particulars in order "to inform the defendant of the nature of the charges brought against him, to adequately prepare his defense, to avoid surprise during trial and to protect him against a second prosecution for an inadequately described offense." *United States v. Urban*, 404 F.3d 754, 771 (3d Cir. 2004) (quoting *United States v. Addonizio*, 451 F.2d 49, 63–64 (3d Cir. 1971)). The district court has broad discretion to balance the "defendant's legitimate interest in securing information concerning the government's case and numerous countervailing considerations [including] the personal security of witnesses." *United States v. Rosa*, 891 F.2d 1063, 1066 (3d Cir. 1989). Accordingly, it is appropriate for the Court to grant a motion for a bill of particulars where "the government's failure to allege factual or legal information in the indictment 'significantly impairs the defendant's ability to prepare his defense or is likely to lead to prejudicial surprise at trial.'" *United States v. Solomon*, 513 F. Supp. 2d 520, 539 (W.D. Pa. 2007) (quoting *id.*).

---

[23] It is unclear from the record whether this is the same report that the Government referenced in its omnibus response (ECF No. 111), when it wrote that "the United States intends to produce supplemental discovery materials to the defense by Friday, February 7, 2020. The United States believes that these discovery materials will better allow the Defendant to identify those unnamed co-conspirators with whom the government alleges he conspired." (*Id.* ¶ 13.)

In determining whether this standard has been met, the Court considers the indictment itself, as well as "all of the information that has been made available to the defendant[]" during the course of the case. *United States v. Fischbach & Moore, Inc.*, 576 F. Supp. 1384, 1389 (W.D. Pa. 1983); *see also United States v. Grier*, No. 12-cr-161, 2012 WL 5614087, at *2 (W.D. Pa. Nov. 15, 2012) ("In ruling on a request for a bill of particulars, a court should consider all information that has been disclosed to the defendant in the course of the prosecution, whether or not included in the indictment." (citing *United States v. Kenny*, 462 F.2d 1205, 1212 (3d Cir. 1972), *cert. denied*, 409 U.S. 914 (1972))). It is not enough that the desired information would be helpful to the defendant, and a bill of particulars may not be used to engage in wholesale discovery of the Government's case. *Grier*, 2012 WL 5614087, at *3; *United States v. Armocida*, 515 F.2d 49, 54 (3d Cir. 1975).

The Court concludes that a bill of particulars is not warranted under the circumstances of this case. The Government is not required to disclose the "when, where and how" of the alleged overt acts underlying a conspiracy, *Armocida*, 515 F.2d at 54, so long as the indictment presents the essential facts, *United States v. Moyer*, 674 F.3d 192, 203 (3d Cir. 2012). Mr. Barnes has access to the information in the Superseding Indictment, which specifies the specific months in which Mr. Barnes is alleged to have engaged in conspiracy as well as the types of drugs the conspiracy is alleged to involve. The remaining counts in the indictment relate to the distribution of those same drugs and the Court agrees with the Government that the informative value of the remaining counts cannot be completely discounted. In addition, Mr. Barnes has access to the evidentiary disclosures the Government has already made concerning the cell phone records and fruits of the searches of 200 Caldwell Avenue and 977 Broad Street.

And finally, Mr. Barnes has access to the redacted FBI report, which the Court viewed *in*

*camera* at the request of the parties following oral argument. Counsel for Mr. Barnes conceded at

oral argument that the report describes a series of transactions between an individual and Mr.

Barnes; counsel further represented that the report contained allegations that the individual

delivered kilograms of cocaine to Mr. Barnes. (ECF No. 153, at 27:16–23.) The Government

argues that the redacted report provides sufficient detail to provide Mr. Barnes with the identity of

at least one other co-conspirator. And after reviewing the redacted report, the Court agrees. The

involved FBI report is detailed and quite specific as to the nature and circumstances of the involved

events underlying the charge at Count One and even though certain (but not all) names are redacted

for the confidentiality concerns noted above, the balance of the unredacted FBI report leaves no

doubt as to the key facts that if proven would easily support the charge at Count One. The Court

therefore concludes that Mr. Barnes—today—has sufficient information to prepare his defense in

advance of trial. The Court therefore denies the Motion for Bill of Particulars.[24]

## V.    Remaining Pretrial Motions

The Court will grant in part and deny in part Mr. Barnes' remaining pretrial motions:

Motion to Produce Evidence that the Government Intends to Use Under Federal Rules of Evidence

404(b) and 609 (ECF No. 98); Defendant's Discovery Motion (ECF No. 100); Motion for

Production of Exculpatory Evidence and Impeachment Evidence (ECF No. 101); Defendant's

Motion for Discovery of Witnesses and Confidential Informants (ECF No. 133); Motion for

Disclosure of Experts Credentials (ECF No. 135); and Request for Pre-trial Disclosure of Hearsay

Statements Pursuant to Fed. R. Evid. 807 (ECF No. 136).

In advance of oral argument, the parties agreed that the Government would produce the

materials requested at least two weeks before trial. The Court confirmed with the parties at

---

[24] Because the Court concludes that Mr. Barnes' Motion for Bill of Particulars should be denied on the merits, the Court has not need to address the timeliness of the Motion.

argument that the Court could consider the motions resolved if the Court entered an Order reflecting that agreement. As there was no objection, the Court's Order directs the Government to disclose the materials sought by Mr. Barnes in these motions not later than two weeks prior to the start of trial. Mr. Barnes' motions are therefore granted to the extent they are covered by disclosure two weeks prior to trial and are denied without prejudice as to any remaining part.[25]

---

[25] In the case of expert witness disclosures, that time period is four weeks in advance, and the Court's Order will also reflect the Government's open and ongoing *Brady* and *Giglio* disclosure obligations. *See* LCrR 16(C).

## VI.   <u>CONCLUSION</u>

The Court concludes that the magistrate judge who issued the warrant to search 200 Caldwell had a substantial basis to conclude that probable cause to search existed, and in any event, that the good faith exception would apply, upholding the executing officers' reliance on the issued search warrant and forestalling suppression of the evidence at issue. Accordingly, the Court denies Mr. Barnes' Motion to Suppress, and the physical evidence discovered will remain in the record and in the case. (ECF No. 102.)

Second, the Court denies Mr. Barnes' Motion for a Bill of Particulars as the Court concludes that Mr. Barnes has sufficient information to prepare his defense for trial. (ECF No. 99.) Finally, the Court grants in part and denies in part, on the terms as outlined above, the remaining pretrial discovery motions filed by Mr. Barnes (ECF Nos. 98, 100, 101, 133, 135, and 136), as the Government has indicated its intent to disclose certain information reasonably in advance of trial.

An appropriate Order will follow.

  s/ Mark R. Hornak
Mark R. Hornak
Chief United States District Judge

Dated:   December 20, 2021

cc:        All counsel of record